## SAMUEL C. COBB *vs.* ALFRED BLANCHARD & others.

A bill of lading signed by the master of a vessel by request of the charterers' agent is not conclusive evidence of the course of the voyage which the master is to pursue, if the charter contains mutual stipulations as to the course of the voyage and the mode in which the vessel is to be employed, and there are other circumstances to show that the bill of lading was not intended to have this effect.

If a vessel is chartered for a voyage from a port in Sicily to Boston, with the privilege of using a second port in Sicily within certain lay days, which are fixed, and on arriving at a port in Sicily the master takes in part of a cargo and signs a bill of lading which is prepared for him by the plaintiff's agent and which recites that the vessel is " bound for Boston," and he thereupon sails at once for Boston, without waiting for a full cargo or the expiration of the lay days, the bill of lading is not conclusive evidence, in an action by the charterer against the owner to recover damages for the injury caused thereby, to show that the master was bound thus to sail at once directly for Boston, or that he exercised good faith in so doing; but if there is evidence tending to show the contrary, the question should be submitted to the jury.

CONTRACT upon a charter, dated October 14th 1863, by which the defendants, in consideration of $3000, let the bark Lucy A Nickels, then on a voyage from Callao to Marseilles, to the plaintiff, " for a voyage from a port in the island of Sicily to Boston or New York, with the privilege of using a second port in Sicily within the lay days, if required;" "the master to sign bills of lading for any part of the cargo at any given rates of freight, if requested to do so, without prejudice to this charter party;" with a provision for thirty running lay days in Sicily, including time used in changing ports, and also forty silver dol lars per day demurrage. There were also other stipulations not now material.

The declaration averred that the vessel in pursuance of the charter proceeded to Licata, a port in Sicily, where she arrived on the 9th of March 1864 and took in three thousand and ten cantars of sulphur, which composed a small part of her cargo, and then, on the 13th of the same month, contrary to the agreement of the charter and without waiting for orders, and contrary to the directions before given to the master, sailed directly to Boston with only said part of a cargo on board, and deprived the plaintiff of the privilege of bringing a valuable cargo from a second port in Sicily, Palermo, where he had one engaged.

The answer admitted the making of the charter, and averred that the vessel went to Licata in pursuance of instructions of the plaintiff or his agents, and took on board there all the cargo that was offered, or that he was requested to take on board by the plaintiff or his agents; that the master was then required by the plaintiff or his agents to sign bills of lading of said cargo as taken on board for Boston, without any mention of any intermediate port, and did sign such bills of lading, and thereby became bound to proceed with said cargo to Boston; and that he was instructed by persons acting for the plaintiff at Licata to proceed directly to Boston. The answer also denied that any instructions were given to him to proceed to any other port in Sicily, and averred that there is no port at Licata where a vessel can lie in safety, and that the cargo is taken on board in lighters

while the vessel lies in the open sea, and that she departs as soon as the cargo is on board.

At the trial in the superior court, before *Allen*, C. J., the charter was put into the case, and the following facts appeared in evidence :

In November 1861 the plaintiff had chartered the same bark for a voyage similar to that described in the present charter, and with similar stipulations; and then four thousand cantars of sulphur had been taken as cargo at Licata, for which the master signed a bill of lading, reciting that the bark was " bound for Palermo for a port of discharge." The plaintiff testified that in December 1863 he directed Gardner, Rose & Co., his correspondents in Sicily, and his agents there to conduct the voyage, to obtain a cargo in Palermo for the bark after she had taken in sulphur at Licata; and on her arrival in Boston he examined her hold and found that she was not more than one third laden ; and that on her former voyage she took in a similar lot of. sulphur at Licata, and then went to Palermo and filled up.

On the 1st of December 1862 the plaintiff wrote to the master of the bark, at Marseilles, that he had again chartered the bark, to proceed to Sicily to load for Boston or New York, and requesting him on his arrival to telegraph to Gardner, Rose & Co. and write them by mail, " stating when you will be ready to leave, and asking them to inform you which port to go to first, as you are to use two ports, as before, within the lay days, so that you may know just what to do when you are ready to leave Marseilles."

On the 22d of December, Gardner, Rose & Co. wrote to the master, at Marseilles, as follows : " We have in our possession the charter party of your vessel. The object of the present is to inform you that after you have discharged your outward cargo you will proceed to Licata, where our agent, Mr. William Franck, has necessary instructions as to the quantity of brimstone to be shipped on board your vessel." The master thereupon wrote to the defendants in Boston : " I have received orders to go to Licata to take brimstone, and shall probably go to Palermo to fill up, unless they give me a full cargo

of brimstone, which they have a right to do under the charter party."

On the 16th of February, 1864, Gardner, Rose & Co. wrote to William Franck, at Licata, informing him that the bark would soon arrive there, and directing him to advise them of her arrival by wire so that they might send down the needful letters of order for the sulphur she would take in at Licata; and adding, " Bill of lading to be thus filled up : ' Bound to Boston, consigned to Mr. F. C. Butman, freight $6 p ton and 5 p c primage per ton of 13 cns.' "

The bark arrived at Licata on the 9th of March, but Mr. Franck was absent at that time, and also at the time when the above letter to him was sent, having left a power of attorney with Gregorio Salto, his chief clerk. Salto could not speak or understand English, and a son of Franck, a young man eighteen years old, acted as interpreter when there was any business with Englishmen or Americans. This son told the master of the bark that Salto had orders to put the brimstone on board, and to fill up the bills of lading for Boston, according to the instructions of Gardner, Rose & Co. in their letter of February 16th, which was shown to the master. The brimstone was accordingly put on board, and a bill of lading was prepared, which was signed by the master, stating that the bark was " now lying at Licata and bound for Boston." No special instructions had been given by Gardner, Rose & Co. other than the above, and no special instructions were given to the master by Salto or young Franck. The master thereupon, on the 13th of March, sailed directly for Boston without having any communication with Gardner, Rose & Co. A coach ran between Licata and Palermo three times a week, the passage requiring from thirty-four to forty-eight hours, and there was also a telegraphic line. Gardner, Rose & Co. had prepared a cargo for the bark at Palermo, and they testified to the current rates of freight from there to Boston. The master was one of the owners of the bark.

The plaintiff contended that this evidence, if believed, would warrant a jury in coming to the conclusion that the master had

not performed his duties under the charter; that he was bound in the exercise of a proper discretion to ascertain from Gardner, Rose & Co., at Palermo, by the means of communication at his command, before signing said bill of lading or before leaving Licata, whether it was intended that the bill should be made out as it was, and whether it was intended that he should proceed direct to Boston with only one third of a cargo in the vessel; that he had no right to leave Sicily without leave within the lay days; that the evidence showed a want of good faith and such fraud or culpable negligence on the part of the master towards the charterer as rendered him and his co-owners liable in this action; and that the instructions he received from the charterer and the other facts within his knowledge were sufficient to cause him to suspect that the instructions contained in Gardner, Rose & Co.'s letter to William Franck were not to be literally complied with, and to put him to reasonable inquiry in regard thereto. But the judge, for the purpose of raising the question of law, refused so to rule; and ruled that the master upon the facts disclosed by the evidence was authorized to proceed as and when he did to the port of Boston, and therefore the action could not be maintained; and he directed a verdict for the defendants.

The plaintiff alleged exceptions.

*E. D. Sohier*, for the plaintiff. Mr. Franck, the sulphur agent at Licata, had no authority to direct in any way the movements of the vessel. He was only an agent to buy and put on board the sulphur. And no instructions were in fact given by him or his clerks or servants to the master. The master had reason to know that it was intended that he should use two ports in Sicily, as he had done on the former voyage. He knew that Gardner, Rose & Co., at Palermo, were the plaintiff's agents to conduct the voyage; that they had conducted the former voyage; and that William Franck was absent and his son was inexperienced. He had cause to believe that it was not intended that the instructions as to the wording of the bill of lading should be literally complied with; and was put to the inquiry. He might easily have communicated with Gardner, Rose & Co. He must have

intended to take an unfair advantage. The bill of lading has no effect to excuse him. The shippers had a right to alter it at any time before it was delivered to the consignee. *Mitchel* v *Ede*, 11 Ad. & El. 888, 903. *Low* v. *De Wolf*, 8 Pick. 101. *Allen* v. *Williams*, 12 Pick. 297. If the master knew that the agents had no more cargo, he should have made exertions to obtain more. *Heckscher* v. *Mc Crea*, 24 Wend. 304, 313. He was not bound to proceed directly to Boston if the shippers of the sulphur knew that he was to go by way of Palermo. *Lowry* v. *Russell*, 8 Pick. 360. He had no right to sail within the lay days.

*J. C. Dodge*, for the defendants. The master was not charged in any degree with the duty of a supercargo. The plaintiff undertook to direct the voyage through Gardner, Rose & Co. The master's only duty was to sail the vessel, and to obey such orders as he received. He was required to sign the bill of lading representing the vessel to be bound for Boston. The letter of Gardner, Rose & Co. gives directions that it should be made out in this form. If he had refused to sign the bill of lading, the defendants would have been responsible for any loss in consequence. The bill of lading being signed, it became the contract by which the conduct of the master was to be governed, and bound him to proceed for Boston without delay. Touching at an intermediate port, without necessity, would have been a deviation, and subjected the defendants to the consequences of a deviation. The fact that the lay days had not expired did not justify a delay. The lay days are for the benefit of the charterer, and if the charterer directs the master to sail, the master is bound to do so.

The plaintiff never requested the master to give any notice of his arrival at Licata. On the other hand, the letter from Gardner, Rose & Co. to Franck charges him with that duty. Nobody could impose on the master a legal obligation to give such notice, while sailing under that charter. *Sieveking* v. *Maas*, 6 El. & Bl. 670. *Harman* v. *Clarke*, 4 Camp. 159. *Harman* v. *Mant*, Ib. 161. But in fact no one ever requested him to do so. There can be no fraud or culpable negligence where there is no legal obligation. And there can be no doubt that in fact Gardner

Rose & Co. were informed of the arrival of the bark. They do not testify to the contrary.

BIGELOW, C. J. It seems to us that the error committed at the trial of this case was in withdrawing it from the consideration of the jury. The facts which the plaintiff proved had, in our opinion, some tendency to show a want of good faith on the part of the master of the vessel, and a substantial breach of the contract of affreightment into which the defendants had entered with the plaintiff.

We are unable to concur in the position assumed in behalf of the defendants, that the facts proved by the plaintiff show a valid legal defence to the action. As we understand the argument, it is this: The master of the vessel, on his arrival at the port of Licata in Sicily, received no orders from the plaintiff's agents to proceed thence to any other port in the island ; but, on the contrary, he took on board there a quantity of sulphur, for which, under instructions from the plaintiff's agents, he was required to sign bills of lading, in which the vessel is described as being bound for Boston, and the merchandise laden on board is stipulated " to be delivered at the aforesaid port of Boston " to the consignee named therein. It is insisted that, inasmuch as the master was clothed with no power as supercargo or authority to direct the course of the voyage, he was bound to strict obedience of the orders which he might receive from the plaintiff or his agents ; that he had no right to refuse to sign the bills of lading for the sulphur which were prepared for him at Licata ; that these, when signed, became the contract by which his conduct was to be governed, and that in pursuance thereof he was bound to proceed without delay or deviation to the port of discharge therein designated. We have no doubt that this exposition of the duty of the master would be sound and reasonable if the case depended solely on the terms of the bills of lading which the master was required to sign at Licata. But the difficulty in the argument is, that the rights and obligations of the respective parties are not to be determined by these only, irrespective of the charter party and the facts and circumstances of the shipment of the sulphur at that port. It is not true, as a

general proposition, that bills of lading in all cases define, con-
trol and limit the duties and liabilities of the shipper and owner
This would be the rule, undoubtedly, where it was the only evi-
dence of the contract of affreightment.   But it is to be taken
with great qualification where there is a charter party for the
hire of a vessel, containing mutual stipulations regulating the
course of a voyage and the mode in which the vessel is to be
employed.   In such a case, a bill of lading would not necessa-
rily annul or supersede the formal contract previously entered
into by the parties, and under which the cargo or a portion of it
had been laden on board the vessel.   It certainly would not so
operate unless it was intended by the parties to have that effect.
Indeed, a bill of lading is a document often issued only to be
kept in the possession of the master as evidence of the quantity
and kind of goods laden on board and to be transmitted to the
consignee, to be used by him as proof of his right to receive cer-
tain goods at the port of destination, and of the rate of freight
which he is to pay the charterer of the vessel therefor.   It is sel-
dom used to fix the terms of the shipment as between the ship-
per and owner, where there is a formal charter party.   *Gage* v.
*Tirrell,* 9 Allen, 299, 309.   In the case at bar it is manifest that
the parties did not understand that the bills of lading, which the
master might be called on to sign during the voyage contem-
plated by the charter party, were to be regarded as authorizing or
varying the terms of the charter party.   It was expressly stipu-
lated that they were to be made out and signed at any given rate
of freight, without prejudice to the charter party.   Nor do we un-
derstand the defendants to contend that the bill of lading of the
sulphur would have finally and irrevocably fixed the course of the
voyage, if explicit orders had been given to the master at Licata
to go thence to Palermo.   In our opinion, it would be going alto-
gether too far to give it that effect.   The fallacy which underlies
the whole argument of the learned counsel for the defendants
seems to us to consist in the assumption that the bill of lading
signed by the master at Licata absolutely and irrevocably fixed
the course of the voyage, and imposed on him the legal duty
of proceeding at once on his voyage directly to Boston.   No

authority was cited in support of this position, nor have we been able after some research to find one which goes to the extent of maintaining it. That it might have the effect contended for in a certain state of facts, we do not doubt; but that such is the established rule of law in all cases, or that the facts proved at the trial showed conclusively that the parties intended such to be the effect of the bill of lading which the master signed, or that he in good faith might reasonably have inferred from the circumstances of the shipment of the sulphur and the tenor of the bill of lading that it was his duty to proceed directly to Boston, we are by no means prepared to admit. *Prima facie*, the bill of lading might have warranted such a conclusion ; but even that would be rebutted, if the master had reason to believe that the charterer and shippers did not intend that he should proceed directly to Boston, especially if he might fairly have inferred that he was to await orders after receiving the sulphur, and to go to another port in the island to complete the lading of a full cargo. *Lowry* v. *Russell*, 8 Pick. 360.

We can readily understand that there may be facts which will show that the master acted in good faith in setting sail for Boston as soon as the sulphur was put on board the vessel. He certainly was not bound to communicate the fact of his arrival at Licata to the plaintiff's agents in Palermo, or to apply to them either by mail or telegraph for orders. No such duty rested on him or the owners under the charter party; it was incumbent on the plaintiff through his agents to convey to the master directions to go to a second port in Sicily, within a reasonable time after the arrival of the vessel in Licata, if it was the plaintiff's intention to take in additional cargo. What would be a reasonable time would depend on circumstances as they existed at the time the lading of the sulphur was completed. If there was a reasonable probability that orders to go to Palermo would be seasonably received, so as to permit the vessel to go there and take in the residue of a full cargo before the expiration of the lay days stipulated for in the charter party, it would have been the duty of the master to remain long enough to receive such orders, unless there was a sufficient reason for

an earlier departure from the port; such, for example, as the dangerous condition of the roadstead or harbor, which would render a longer continuance there hazardous. The master could not be required to await orders in a place where his vessel could not lie in safety, nor, on the other hand, could he depart suddenly without waiting a reasonable time on a mere apprehension of perils, if none was really imminent. The master well knew that the vessel was let under a charter party which allowed the hirer to use a second port in Sicily, with a privilege of thirty lay days; he was informed by the plaintiff that it was his intention to use two ports, as he had done under a previous voyage of the same vessel under a similar charter; he went to Licata, as the first port, where he took in cargo sufficient only to fill about one third of the vessel, the freight on which would be insufficient to pay the amount agreed to be paid for the hire of the vessel; he knew, by inspection of the letter sent by the plaintiff's agents in Palermo to the merchant in Licata, that the latter was only authorized to buy and put on board the sulphur, and that he had received no instructions whatever to name another port to which the vessel was to go, or in any way to direct her future movements, except so far as it might be inferred from the form in which the bill of lading of the sulphur was to be made out, and that no other instructions were in fact given as to the destination of the vessel. In this state of facts, the vessel having arrived on the 9th of March, and having completed the loading of the sulphur in the course of three days, the master left for Boston on the fourth day after his arrival, there being twenty-six lay days still unoccupied. These and other minor facts disclosed by the plaintiff's evidence tended to show that the master did not wait a reasonable time for orders at Licata, but that he set sail therefrom prematurely, contrary to his duty and the stipulations of the charter party, acting in bad faith and intending to deprive the plaintiff of the benefit and advantage to which he was fairly entitled under his contract with the owners. On the issue thus presented, we think the plaintiff had a right to ask that the jury should pass. *Exceptions sustained.*